Good morning, Your Honors. May it please the Court, Gen Digital, formerly Symantec and Norton, appealed four errors from below that culminated in a $600 million final judgment that we ask you to set aside. Subject to Your Honor's questions, I'd like to focus this morning first on the 101 and infringement issues and the liability issues, and then if I have time remaining, to turn to the foreign sales issue that was raised on appeal. The 101 issue, I think, is a particularly apt place to start in this case because after seeing the red brief, Columbia does nothing or little to defend the District Court's error. The District Court in this case plainly found the so-called technological improvements that she relied upon to find that the claims were not abstract from the specification and not from the claims. This Court's decisions in American Axel tell us the recitations in the specification that are not in the claims are irrelevant. Okay. Let's say that I'm not buying that argument. I think there's enough groundwork left that starts the claim language to bring you to the spec, and I think we've got cases that allow use of the spec. So let's take that argument off the table for purposes of argument. What do you have left? I mean, Columbia argues that creating a model from two different computer models not only increases efficiency, but improves reliability or security because the combined models make it harder for the attacker. Maybe I missed it, but I didn't see where in your briefing you addressed that point. And in any event, isn't that sufficient to improvement in computer functionality besides step one? It's not, Your Honor. So if we're turning to the specification, the specification on the models, and we do address this in our brief at appendix page 287, tells us, and this is column 8, line 15 through 27 of the 322 patent. We always use the 322 as the exemplar. It says that the person building the claimed inventions can use, quote, any of a variety of suitable means for combining these models. That tells us not only is the notion of combining models known, but how to do it is known. There's no specific method for it. The claims don't tell you what the model is, how to build it, how to combine it. You're essentially taking a black box model, combining it with another black box model, or an abstraction combined with an abstraction. And so the specification on the models in particular, we think, is fatal to their cause. Then, if you look at the specification more broadly, it goes out of its way to tell you that everything in the claims is conventional, that it's using things that were known in the art. At appendix 285, column 3. Well, that seems to be the heart of the issue, is what's conventional here, and whether there is anything in particular claims here which are non-conventional. Yes, Your Honor. I agree, and our view is strongly held that there's nothing in the claims that's non-conventional. The models, I think, is their champion argument on that. I just pointed you to specification language that tells you that you can use any suitable means for combining those models. If you go to the file history in the IPRs, the board expressly found that a prior art reference called Agarwal taught combined models that were made at different times. The dispute and the breakdown came whether there was a combined model made from different computers. I think you'll hear different views on that issue, but when you look at the evidence from the final written decisions... Some of the claims seem to talk about combined models, which are non-standard models, but those claims are not asserted here, like in the 115 patent claim 9 and the 322 claims 17 and 25. Those were invalidated, I think, in the IPRs. Whether they are 101 eligible or not is not the issue here, but what I get from those claims is that when they wanted to claim a non-standard model, they knew how to do it, and they didn't do it in these particular claims that we have here. That's exactly our view, Your Honor, and the specification for other supports that they are telling the world, they are telling the public that this notion of combining models is a conventional one that can be done by, quote, any suitable means, and they use that language throughout the specification to point out that they're not using new techniques, no new improved model, no new improved... What about in the combination? I mean, this claim survived the IPR. I haven't gone through the entire record of the IPR, but because there was no motivation to combine, suggesting there's some novelty in what went on and this is not exclusively conventional, right? So two points on that, Your Honor. The board found that there was no motivation to combine, as Your Honor put it, to preempt what my friend is going to say. They said there was no motivation to combine that would teach the combined model made from two different computers. So they did say that language, but they also refer, they acknowledge the argument from Norton at the time and its expert that Agrawal taught combined models from multiple computers. They say there's just no motivation to combine the systems together to get the combined model together with the other. So from our perspective, that shows at least that it's conventional there. The specification tells us it's conventional. The law is clear. The SAP case and the Symantec case, for example, that we've cited in our briefs... But what specification teaches it's conventional? What's the if here? Using two computers to create a single model? Just combining models anyway, Your Honor. The specification, again, it said... There's an argument in the red brief, as I understand it, that the heart of this is efficiency. You can create a combined model more efficiently by the use of two computers or multiple computers rather than one computer, correct? The district court said that too. Yes, that's the argument. That is completely contradicted by the specification. So the judge... Wait a minute. What's contradicted? Let me point it out. So the judge said the improved efficiency... This is at appendix page 21, was due to the use of distributed sensors, not models, sensors, that those sensors could be used to collectively build models more efficiently. The specification, where I say it contradicts it, is appendix 289, it's column 12 beginning at line 44, says you can use any suitable sensors. It doesn't say you're using special sensors, and the claims certainly don't say use distributed sensors in order to achieve more efficiency in combining models. So the claims don't say distributed sensors... My understanding of efficiency is that you can do it more quickly by using multiple computers rather than one computer. Okay. A couple of responses to that. So SAP tells us even if it's novel, even if it's groundbreaking, even if it's revolutionary, that doesn't get you to eligibility. Symantec tells you even if it's not obvious, it doesn't get you to eligibility. The EOLIS case... We're not on the same page. The EOLIS case, I think... I think Judge Dyke is trying to help you, if I'm understanding correctly, that if it's just efficiency, it's not enough. You use two things rather than one, and that grants you efficiency, and that's abstract. If I'm arguing with you and you're trying to help me or not, I apologize. I think the court's decision in EOLIS says that same thing, which is distributing computing in order to make it faster, more efficient, is not also something that's going to take you out of being abstract. How do you distinguish this case from FinGen, number one? And then number two, why am I wrong in looking at this case as not a case representing a technological solution to a technological problem? So this has only happened in the computer space area. It seems to me that a problem has been identified. The claims speak as to addressing that particular problem, and they're directed to a specific solution. So in reverse order, Your Honor. Even EOLIS said that it was limited only to computers. The claims recited computers. It was going to be something that, while a human might be able to do it, it would take too long. So that it recites computers as a way to make things more efficient, back to the efficiency point, is exactly what EOLIS and then many decisions in this court have said is abstract. In the computer world, there's a particular problem, right? This has to do with cybersecurity. It does. So a fair warning, sort of personal letter, so that it's mandatory. Setting aside that all computers are conventional, there's still problems that arise in the computer space that pertain to that particular space. And I see this as one of those problems. Am I wrong on that? I think you are wrong, Your Honor. I think all you have here is the abstract concept of taking data from a program, comparing it to a model, and seeing if it's anomalous compared to that model. That's the organization or the classification of data. But it combines both models. There's a combination of both models. So there's actually a step that you missed there. Well, on the combined models, so fair warning is maybe my best case on this, Your Honor. If you go to the fair warning case, which we rely on heavily in our papers, they never mention by name. There's no response to fair warning, personal web, or Symantec in their papers. They don't even refer to the cases. Fair warning has a combination, too. It takes data. There are these audit logs that are being investigated. And the data going into those audit logs is combined from multiple sources, which the specification and the opponent, the patent owner, excuse me, argued, showed it made it more robust, made the data better, made it so you could learn more about your user and your patient to improve the quality of the computing. That was not enough, because all you're doing is combining abstractions at that point. You were going to address FinGen, weren't you? Yes, thank you. So FinGen is, I think, very supportive of our position. In FinGen, what the court found was a new kind, that was the quote, new kind of file that didn't exist before. It was a file that included something called a downloadable and a security profile. And not only did it not exist before, but the court found that it did things that weren't done before, that this new file that never existed before could identify suspicious code and detect dangerous or unwanted operations in a way that was unconventional. Conventionally, what it was saying was done was essentially what the claims in this patent do, which is compare to a model or a database and say, is this green light or red light? Is this a good or a bad action or operation? Is this access allowed or denied? That was conventional. What FinGen said was, this is a whole new behavioral approach. We just don't have that fact pattern here. There's no new kind of file. The combined models are conventional. It's not doing something new that couldn't have been done before. And I don't think there's been any evidence to the contrary in any of those things. If you've finished answering, Judge Rayner, what do we do on step two, even if we were to agree with you on step one? I think Your Honors can address step two yourselves as a matter of law. It's certainly in your purview. We were talking a lot in the other case about due process and sufficient notice. There was nothing that went down here. I mean, this case went down on a motion to dismiss, and then this went away at trial. So how are we satisfied that the parties had an opportunity to make their arguments and someone had an opportunity to review those arguments? So I think where we sit on that is, you're right, it went down on rule 12 motion. Did the motion to dismiss cover both steps one and two? The motion did. The opposition did. The judge found that it was abstract for the reasons I said, and so never reached step two. In a clarification order, the judge then said, I'm throwing this out as a matter of law, the whole thing. And so I think the parties addressed step two, the court didn't. Your Honors in at least Free Stream Media and I think it was CardioNet have addressed step two, even when the district court didn't get to it, when the district court did what this one did, decided on step one. So you could, if you choose to, and we would certainly urge you to, because we don't think there's anything new that needs to happen down in the district court, to assess the intrinsic evidence here. It's a de novo question anyway. It's in front of your Honors who can resolve this case for them. So we would ask you to go ahead and do step two. You certainly could send it back if you chose to. Back to the specification, if I might, though, I just wanted to point out that the specification tells us that everything here is conventional. Appendix 285, Column 3, Line 16, it says you can use any suitable algorithm for anomaly detection. You can use the stem or the bowel grind emulators that were known, prior art emulators. You can use, quote, any other suitable technique. And you see this for all of the different pieces and parts of the claims. And I don't have time to go through each of them, but I'd point out Appendix 287, Column 8, beginning at Line 15, Appendix 289, Column 11, beginning at Line 19, and Appendix 293, Column 19, beginning at Line 49. I'm almost out of time. I'm going to turn to the infringement issue, unless Your Honor said questions for me further. I probably went to the enhancement issue. The enhancement issue? So, Your Honor, if we would ask you to reverse on the enhancement issue, because it's premised on two pieces of analysis that we think are both faulty. One is on willfulness. The second is on the so-called litigation misconduct, which I understand, and I'll concede is a factual issue with a lot of. Well, you've got two pieces to your argument. One goes to the case we're about to hear next, which is assuming hypothetically we remove everything dealing with the dossier litigation in this case. Okay. We're still left with findings and a conclusion by the district court of the enhancement. And she suggests, without really saying clearly, that she's not considering the negative inference in reaching her conclusion. May I answer that? Yeah. She says that. She also says that the so-called litigation misconduct weighs as heavily towards enhancement as it possibly could. So she says both things. And we think it clearly when you read the analysis. You can see that that finding on litigation misconduct, which we strenuously disagree with, was very, very important to the way she got her decision. So the rest of it goes to willfulness. You get a remand if there's something left to it. And the judge will get a do-over, right, even if they agree just in spite of it. I think if you decide it's a matter of law, there's no willfulness, then there's no need for a remand. Okay. Let's assume you don't. Then I think you're back to a remand. Okay. Then I think that probably would go to a remand if you found that there's willfulness. Yes. But the litigation misconduct was way too heavy. There are other questions. Well, if there's anything left other than if you take away the inference and the dossier dealing with the other litigation and the other patent. You challenged in your brief the closeness of the case, her argument that it was not close. And you challenged other pieces of her taking it apart. There's a number of lead factors that I think that the parties have addressed both. But let me ask you, of the closeness of the case, I mean, it seems to be kind of a legal question. Can you consider an enhancement, all the other stuff that went on beforehand and the stuff that you prevailed? There's no right or wrong answer to that, right? I think there's – I think what – the way I would read the case law is that you look at the totality of the circumstances on the closeness of the case. I think it's wrong, as Columbia says, that you should disregard the things that happened pretrial. Well, how does that jive with the point you were making four minutes ago, which is we should take away everything that happened in the dossier stuff? That stuff was part of this litigation initially. So you can't have it both ways. No, no. Either we're going to – we're supposed to include everything starting back five years ago or we're not. I don't disagree, Your Honor. I'm not asking to have it both ways. But the dossier argument, the dossier so-called misconduct, went to an issue we won in front of the jury. It went to the question of fraudulent concealment. What they say dossier was going to do was come to court and say, I think this patent that Norton has should have your name on it. That was a fraudulent concealment claim about Norton's patents, not about the patent's dispute.  But if we're talking about the closeness of the case, we're dealing with the infringement findings of the jury. Sure. Which were narrow. Why should other stuff that happened before necessarily, as a matter of law, be required to be considered by the district court in this circumstance? I think when you look at closeness of the case, you look at the case as a whole, not just the last three weeks of the case. And the case as a whole is one in which, over and over again, Norton had significant success. Claim construction went its way. All six patents were found not to be infringed. Most of the claims were invalidated in IPR. Most of the claims even of the patents in suit were out of the case. And so if you're talking about closeness of the case, which decisions of this court have done broadly, then you have to look at everything, not just the jury trial. Could you address the extraterritorial issues and foreign sales? Yes, Your Honor. So on the foreign sales point, maybe what I'll do to try to be as brief as I can is just go straight to Brumfield. So this court's decision in Brumfield, we think is dispositive in establishing that the foreign sales in this case should not have been included in the calculation of the reasonable royalty. Well, they didn't define what proximate causes. I mean, Brumfield left some issues open. It did, but there's a but-for. I'm sorry. I didn't mean to interrupt, Your Honor. Go ahead. We believe that the facts in this case fail the Brumfield but-for causation test. I agree with you that proximate cause is not fully vetted yet as far as what it means, but it establishes a but-for test that says, the domestic conduct was the value of that infringement increased by the foreign sales. And when you go through the facts, so if you look at the facts of Brumfield supplying Western Geco, the master software in both cases was made, developed, updated, tested in the United States. The master software, there was a CRM claim in both patents from Brumfield in this case. Is that the CRM claim? There is a CRM claim in both, Your Honor. There's a CRM claim here, claim 11, and there was a CRM claim in Brumfield as well. Both the master disk was made in the U.S. Made in the U.S., developed, tested, all of that. And maybe most importantly is that master software was made before the patents issued in Brumfield and here. And that's really important to the but-for cause question, because the overall software, the instructions that go into what they say infringe, were done in Sonar Bash, the accused products, two years before the patents started to issue at least. And so the same thing was true in Brumfield. And what that left was a question, well, what happens two years later when the patents issue that could not have happened overseas? Brumfield says, let's assume, just for sake of argument, that the manufacturer, the first initial development, design, all of that stuff had to happen in the U.S. You can make the same assumption here. Let's just say it had to happen. The question then becomes, well, what about two years later when the patents issued? Why couldn't it have been replicated overseas at that point in a way that would have been non-infringing? And there's no evidence in this case. There's no jury finding. There's nothing from the judge that says either the later enhancements to Sonar Bash when the patents came out were themselves adding to the infringement or necessary, necessary to enable the foreign sales because you could have replicated it overseas. And there's nothing in the verdict, the final judgment, the judge's analysis, that says, back to the but-for question, that the value of that making of the software, of the master, was somehow enhanced by the foreign sales. So the making was excluded and affirmed for being excluded in Brumfield. It was allowed to happen and go to the jury in this case. That was legal error. There's a lot more I could say on Brumfield, Your Honor. I recognize I'm way over my time, though. Did you want an address further? I think we're out of time. We'll give you two minutes for a moment. Thank you, Your Honor. Mr. Guzman. Judge Dike and may it please the Court. I first wanted a point of clarification. The four claims that were asserted were claims to 11 and 27 of the 322 and claim 2 of the 115. And all of those claims have the combined model limitation that says, wherein the model is a combined model created from models created using different computers. So all of the claims have that limitation. Let's talk about whether these claims include things which are not conventional. It may be that the specification has things in it which are not conventional, but I'm not quite understanding what's not conventional about the claims that are asserted here. And, you know, to some extent you argue that it features seal activity, except the claims don't require seal activity. What is it that's in the claims here that's not conventional? You would agree, I assume, that merely dividing a task that might have been performed by one computer among two or more computers is conventional. That's not something that renders it not an abstract. I agree with Your Honor. But if I may, there is a lot more to these patent claims than just dividing a task among multiple computers. And if I could just spend, like, two or three minutes drilling down on the claimed invention, I'd like to persuade you that there is a lot more here than just the concept Your Honor mentioned. If we think back to when the professors came up with this invention, it's 22 years ago. I was graduating high school. And the Columbia professors gave computer systems the ability to detect new malware. Okay, but we can't talk about the claims. Yeah, and if we look at the claim elements, there are really two parts to it, Judge Dike. First is the professors discovered that normal programs tend to access or call the operating systems. But you keep talking about what the professors invented. And it may be they invented something that's non-abstract. I'm talking about the claim language here. I mean, you have a complex specification, which may well include things that are non-abstract. The question is, do these claims here, of which claim two appears to be representative, incorporate that? Yes, they do, Your Honor. So when I'm talking about what the professors invented, I'm going to tie everything to something that's in the claim language. So we can agree that the claim language includes function calls. In fact, the entire claim is built around function calls. And what the professors discovered is that the function calls made by normal programs have recurrent patterns. And to translate that into a technological solution, the claims talk about a model of function calls. And comparing a function call made by a program. But modeling was conventional. That was well known, right? Not modeling function calls, Your Honor. So nobody was modeling function calls at the time. And the first half of the professors' invention here. Where do I find that? Where do I find the idea that modeling function calls wasn't conventional? Well, so if the court looks at appendices A and B to the provisional patent application. For example, at appendix 4189. And then this is mentioned in the specification of the 322 at column 1, 26 to 33. At the time, computer defenses used rules that were based on the attributes of known programs. And those didn't work when it came to a new type of attack. So what the professors did was. Can you, I'm not going to dig through the appendices right now. But since you mentioned column 1 of 322, can you tell us what you're talking about in column 1? Yes, Your Honor. So it's mentioned briefly here in column 1 of the 322 at lines 26 to 33. But it talks about the various types of computer attacks. And it says that many computers are protected by antivirus software and firewalls. However, these preventative measures are not always adequate. And what that means, Your Honor, to a person. But where does it say modeling function calls was not conventional? And, you know, you talk about what the professors invented. That's very interesting. But I've got to find it in the claim as construed in the latest specification. I agree, Your Honor. But what I'm saying is the use of function calls specifically to identify malware, abnormal program executions. Which is what the claim language says. Nobody had done that before. Is that, in your view, is that the one thing that's not conventional about Claim 2? No, Your Honor. I think that as construed, the selective emulation, because the claim Selectivity is not a claim requirement. It is within the claim, but it doesn't require selectivity. But the court assesses Step 1 of the Allis. Let's put that aside for a moment. But the court includes in its assessment the claim constructions. Because the constructions define the meets and bounds of the claim. The construction is not that this is limited to selectivity. The claim on its face is very clear that it's not limited to selectivity. But the claim construction requires selective execution, Your Honor. And the claim talks about executing at least part. Where does the claim construction require selectivity? The claim construction is software. Where? At the end.  What page? The court's claim construction order, Your Honor. What page? Apologies. Apologies, Your Honor. I don't have the citation right at hand. But the district court's You're supposed to come here. You make arguments. You're supposed to be able to point as to where the stuff you're relying on appears. I apologize, Judge Dike. I have the construction memorized, which is software alone or in combination with hardware that permits the monitoring and selective execution of parts or all of a program. Parts or all. It includes all. But it has to be selective execution.  I don't want to argue with you about this. But it seems to me on the face of it, it clearly includes all. Well, no. But what was novel and what was not conventional, Judge Dike, and this is described in Appendix C to the provisional in a fair amount of detail, what was not conventional was using the emulator to selectively execute parts or all of the program. But that's not a requirement of the claim. That's the problem. It says select or all. Parts or all. But it has to be selective. I don't want to argue with you about this. But let's pass over this one. And is there any other feature of this that's not conventional? I believe it's the combination, Judge Dike, of selective emulation together with the combined model of function calls, which when those things were put together, they changed the way that a computer... Did the district court rely on the modeling of function calls as being not conventional? The district court relied on the model of function calls itself as being the key point. Okay. Could you show me where it talks about that? Yes, Your Honor. In the court's 101 analysis, which is... Here at Appendix 19 to 21, Your Honor, which is the court's decision denying Norton's...  Where is the specific language about the modeling of function calls not being conventional? What was that page under where it gave counsel? I have Appendix 21 to 23, Judge Rayner. And apologies. The most specific language I would like to rely on is Appendix 24. And at the bottom of the page, Judge Dike, the court says, similar to the patent claims in Finjen, the 322 patent utilizes a new type of model that improves the efficiency of computer virus screening. That doesn't refer to function calls. Well, but what the court's talking about is the claims model of function calls, Your Honor. Where's this in your brief? In our brief? Yeah. Where does the brief talk about what's not conventional here is the modeling of function calls? Well, we address that... We talk about the model of function calls not being conventional at page 39 of the blue brief. 39? Nine of the red brief, Your Honor. Where? We say, as construed, the model must be created using the function calls actually made during program execution. And we point out it cannot be created based on a program's static code. We're talking about modeling function calls, which is a specific action that occurs in a computer system. Okay. Where does it say that modeling of function calls is something that's new? Is something that's new? Yeah. I believe that's what we were intending here on page 39, Judge Dike. Okay. All right. Go ahead. But I want to emphasize what we're talking about in these patent claims is something that actually changed the way that the computer system worked. When you put this software on the computer, it was able to detect malicious programs that it could not detect before. If we look at precedent from this court, the FinGen case and the SRI case, for example, and even ENFISH, the claims here have more detail. They have more specificity about how to protect a computer than the eligible claims that we had in FinGen, SRI, and ENFISH. And I think that what we have – They're different. I mean, each of these cases is different. But FinGen created a new computer file, which was a downloadable, which was attached. We don't have that here. It's different. Well, but in FinGen, the security profile that was created for the downloadable, as construed by the court, that was simply the identification of code that may have a malicious operation. And there was no description about how you do that. And if it was enough in FinGen to have the new security profile, it should be enough here to have a new model of function calls that, when it's put on a computer, allows the computer to detect an abnormal execution that indicates an attack. Are the claims here an advancement in the technology in FinGen? Yes, Judge Rina. So what the FinGen technology did was it scanned static code. So you'd have a downloadable that came onto a computer system, like through email. And the FinGen claims scanned the static code. The claims specifically required an inspector. And then, as construed by the court, that inspector identified code that may contain malicious operations and put it in what was called a security profile that was attached to the program. This is an advancement over FinGen. And the FinGen tech does not infringe these claims because we're not using static code. The program actually has to execute on the computer. And that requires the emulator to protect the system. What was happening in FinGen, the program didn't execute, so it couldn't cause damage. Emulator is not new, right? The use of an emulator. The professor's emulator was new, as described in Appendix C to the Provisional Patent Application. What they did was... But the use of emulators itself is not new, right? That was common. I will give you, Judge Dyke, that emulators were known. The professor's selective emulator that could do all the programs or choose to do parts. Nobody had ever done that before. If I could touch on Step 2, briefly. Before you go, so... If you practice the claim, an issue... Are you, in and of itself, practicing conventionality? Is it conventional just because computers are involved? Is there something else we need to look at? Well, it's not conventional just because computers are involved. You know, as this Court... Well, I don't think so either. Otherwise, you know, all code and all computer patents would be out the window. So, but our jurisprudence is that if you're using a conventional computer and practicing the claims, renders that computer into a non-conventional computer or a special computer. Is that what we have here? That is, Judge Reyna. So what we're talking about is software. Just like in the McRow case. Just like in EnFish. Just like in FinGen. Just like in SRI. It's software. But when you download that software onto a computer, you change the way the system works. It is not simply performing a process or automating a process with a conventional computer. Because the process in the claims doesn't exist outside of a computer system. So you're saying the model of function calls, that's what's not conventional here. I believe it is the combination, Judge Reyna, of the model of function calls. It was not conventional to screen for malware with function calls. There was no computer code that reflected sequences of function calls to detect malware before the professors came up with their invention. And I believe that it is that in combination with the selective emulation of all or part of the program, which Appendix C to the provisional says created enormous efficiency benefits when compared to a virtual machine or another sandbox. 3,000% system improvement, Appendix C says, at Appendix 42.22. So to get away from that selectivity feature, let's assume that we conclude, as I was suggesting earlier, that the claim isn't limited to selectivity. Let's say that's not part of the claim. Is this still non-abstract? Yes, absolutely, Judge Dike. The use of function calls on its own to detect malware was entirely new. And if the court looks at the professor's testimony, for example, if you reach Step 2, and if the court looks at Appendix 522.05-09 and 524.37-45, the professors explain why the use of function calls to detect malware was itself unconventional. Nobody was doing it. And then modeling the function calls. Beyond what the professors, anything in the spec? What's the best you have in the spec? You gave us Claim 1. I'm sorry, Column 1 a few minutes ago. I'm not that good with relying on what the professor said. I'd rather see it in the spec. Understood, Judge Prost. To be candid with you, the best intrinsic record citations I can give you are appendices A, B, and C to the provisional application, which unpack some of the points that are made more briefly. It's not in the spec we're talking about here for the 322 or the 115? But for Step 1 of 101, the court can look to the intrinsic record. No, no, no, just the answer. The answer. It's not in the spec for the 115 or the 322. Well, it is at Column 1, 26 to 33, saying that this invention was addressing inadequacies in antivirus software and firewalls. That's pretty general. Well, but if a person of skill in the art would understand what that meant and they would look to the entirety of the intrinsic record and appendices A, B, and C to the provisional, which were the professor's groundbreaking research papers, that provides a full unpacking of what it means for the invention to address the inadequacies with existing antivirus. And where is that cited in red? Did you cite in your red brief in connection with 101, do you cite these provisional appendices? Yes, we do. So, Judge Prost, when we, in the statement of the case, when we are describing the invention, for example, on page 7 of the red brief, the paragraph on selective emulation, we specifically say, as described in Appendix C to their provisional, and we cite appendix... That's a different point. Hmm? That's a different point. Well, and we cite on page 5, Judge Dyke, where we're talking about the detecting new attack modes, which continues on to page 6. We specifically say, as the professors described in Appendix A to their provisional patent application, and we cite to appendix 4188 to 96. But then you have a whole section that deals with 101 separately, right, in your argument section, page 33 to 41, almost 10 pages. Is that referenced back? It is. It is, Judge Prost. Where does the 101 discussion refer to these appendices? Well, we refer, we supersite, Judge Dyke, back to our description of the invention, just so that we didn't have to repeat everything that we had said about the invention. It's not in the 101 discussion. No, it is, Judge Dyke. Specific references to these appendices are not in the 101 discussion. Judge Dyke, I believe that some of the appendix page numbers are cited in the 101 discussion, but we do supersite in 101 back to the description of the invention. Where does the description of the invention talk about the function? Well, so the page number that I just gave the court, which is page 6, for example, specifically talks about the benefits of modeling function calls made by executing programs in the ordinary course, and then comparing a function call made by an unknown program to the model. But again, it doesn't say that this is not conventional. It doesn't tell us that this was something new. Judge Dyke, if you get to step two, the professors have testified now that this was not conventional. The appendices to the provisional patent application say it was not conventional. And ultimately, after Berkheimer, if there is a fact fight about whether- Could you give us an example from one of the appendices? Where do we find that? Yes. So page 4189 of the appendix, Judge Dyke. Which volume? I think that is volume two, Judge Dyke. 4189? Yes.  And appendix 4189 is the- Where are the appendices? So if you look at the introduction, Judge Dyke,  Where are the appendices? So if you look at the introduction, Judge Dyke, appendix 4189 is the-  It says this talks about the deficiencies in existing computer defenses. And it says- It doesn't talk about not modeling function calls being new. Well, this talks about modeling all anomalies from running programs being new. Well, where does it talk about modeling function calls as new? It says here, Where are you reading from, counsel? Reading from page 4189, which is the first page of appendix A to the provisional patent application. And it talks about the fact that we describe a new approach. Where? Where are you reading from? I'm reading from the top of column two, Judge Dyke, on appendix 4189. It says, We describe a new approach based on anomaly detection using a method that trains on normal data and looks for anomalous behavior that deviates from the normal mode. This method can better identify unknown attacks. And then the paper's talking about access to the Windows registry, which is- What you read doesn't talk about function calls. Well, but Windows registry access is a function call. Okay. This paper talks about why that was new, Judge Dyke. Okay, why don't you take a couple minutes to talk about the other issues that were addressed. Can I just make one comment, which is it's very challenging for us and sort of frustrating. I mean, you've led with efficiency, and then you seem to have given that up, and now we're pivoting to modeling of function calls, which wasn't really an argument fully developed, at least in the argument section of 101, was it? Well, just to- and I apologize for the frustration, of course. I'm not giving up efficiency. I think that the- Okay, but let's turn to the function calls. I mean, in fairness to you, I did find one sentence in red that says the invention accomplished something that conventional methods could not, and it cites to back to 5 and 6. Correct. So in fairness to you, there is some incorporation of that in the argument section. But it's hardly a fully developed argument. Well, but I guess, Judge Prost, we didn't want to repeat everything that we had said in the description of the invention. But you're saying now this is the heart of your argument, and it's not developed in the brief. Well, no, Judge Dyke, I think that what makes the patent claims eligible, all that I'm trying to say is it's more than efficiency. It's the entirety of claims 211 and 27 of the 322, starting from the very first line of the claim language, which looks at a function call that is made by an executing program. It is a specific action that occurs only in a computer system, and this invention changed the way that a computer system responded to that action. I am focusing on step one, and my only point, I'm not trying to deviate from the arguments we made, is to say there is more than efficiency in the claim. I would propose to talk about the global revenue issue, unless the court... I'm way over time, too, so please let me know if I need to stop. It's our time. Go ahead. So on the global revenue issue, I want to start with where my friend left off on this issue, which is the idea that all of the infringement occurred before patent issuance. The record in this case is that Norton made Bash, which is the infringing software. They made Bash version 7.0 through 11.5 on servers in the United States entirely after patent issuance. They had an early version, Bash 6.0, that they made before the patent issued, but the facts here are different from Brumfield because almost all of the acts of infringement occurred after patent issuance. And so we have from 2013 to 2023, Norton making and storing on servers in the United States thousands of copies of its Bash software that had no purpose but enabling sales to customers abroad. Norton admits at page five of its blue brief that it kept these copies in the United States, and this included the foreign-only masters, and critically, this is the critical fact in this case, Norton continuously used these foreign-only copies on U.S. servers to enable distribution of its software to customers abroad. The jury heard unrebutted 30B6 testimony on these issues, and the jury heard that that infringement, the making and using of the invention in the United States, enabled $9.4 billion in revenue from customers abroad, and for that infringement, the jury awarded only $94 million. That was consistent with the running royalty that Norton offered to pay on global revenue when Norton tried to license this invention from Columbia in 2005, and that's Appendix Site 60390-93. Section 284 entitles Columbia to no less than a reasonable royalty for all of Norton's infringement, and the jury was allowed to take this revenue into account. What about the counsel on the other side that argues some sort of temporal aspect should be considered here as to the foreign sales? Well, we disagree with that, Judge Raina. What happened in Brumfield that my friend referred to, the only U.S. copy of the infringing, of the would-be infringing software was made before patent issuance, and it was shipped abroad, and all subsequent copying and use occurred only abroad, and this court said that wasn't infringing. You didn't have any active infringement after the patent issue. What we have here is significant infringement, thousands of instances on U.S. servers that were made and constantly used all after the Columbia patents issue. That makes the temporal point entirely irrelevant. Yeah, but what's the nexus between that infringement and the foreign sales? Well, because whenever Norton created a new version of the BAF software, Judge Dyke, they created what they called a geo-locked version, and this is described at 655-66, and the geo-locked version that was made and stored in the United States was accessible by and openable by only customers in the intended foreign country, and that copy was also translated into the relevant foreign language at 655-54, and all of those foreign-only copies, Judge Dyke, they were stored on servers in the United States, and they enabled the distribution to customers abroad, and they were locked only for a foreign country, and so the nexus between the domestic making and use of the patented invention and the revenue from the customer abroad could not have been more direct. And you think that drum bell then covers you? Yes, because if proximate cause is satisfied by anything, Judge Prost, it would be satisfied when the infringer specifically intends for a domestic act of infringement to cause a foreign sale, which is what we have here. Okay, I think we're out of time. Thank you. Thank you. Mr. Lewis, you've got two minutes. Thank you, Ernest. On the argument that modeling function calls was new and nonconventional, I do think that's a new argument, but it's easily dispatched. Claim 1, for example, a host of claims were invalidated by the PTAB and the IPRs. Claim 1 are good examples. Both 115 and 322 have comparing function calls to models, just like the claims that went to Jericho. Okay, but we're not dealing here with obviousness. We're dealing with 101. Precisely. And what's the evidence here that modeling function calls, one, was the invention, which is the first time I've heard that today. And second of all, what's the basis for saying that it's conventional? So my basis for saying it's conventional, I never heard it before either, so I'm scrambling to answer that question, Your Honor. I think that we know it was in the prior art because we know the IPRs found it to be invalidated in other claims, articulated in the same exact way. Shows us it's not new and it's conventional. There's nothing in the claims that say new types of function calls or new models of function calls. It just says a model of function calls. That's an abstraction. Even if it were new, back to SAP and Symantec, that would go to 102, not 101. You can have an abstract new concept. And so at best, what they have, I'd suggest, is that, if the function calls were new. We don't think they're new. We do think they're conventional because of what the patent board found. Same is true for the selective emulation. I wanted to actually read from the claim, the specification itself. So counsel said that selective emulation by the emulator was new and non-conventional. But if you go to appendix 285, beginning at column 3, line 28, it's referring to the prior art emulators, including STEM. Which, there's no dispute, predates these patents. And it says that STEM, which is described below, and which permits the selective execution of certain parts or all of a program inside an instruction level emulator using the Valgrind emulator. So, I'm sorry, I think I've tripped over into the next discussion of the Valgrind emulator. It's describing STEM as doing exactly what it has told you was non-conventional and new in the prior art. So it's contradicted by their own specification. Okay, I think we're about out of time. Thank you, Your Honor. Thank you both counsel.